**KILPATRICK TOWNSEND &
STOCKTON LLP**
Lisa Pearson (LP 4916)
Robert Potter (RP 5757)
1114 Avenue of the Americas
New York, New York  10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COTY INC., CALVIN KLEIN TRADEMARK TRUST, CALVIN KLEIN, INC., CALVIN KLEIN COSMETIC CORPORATION, HUGO BOSS TRADE MARK MANAGEMENT GMBH & CO. KG, and MARC JACOBS TRADEMARKS, LLC<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>COSMOPOLITAN COSMETICS INC., EUGENE ABRAHAM, WILLIAM GOLD, and COSMETIC MERCHANDISE CORP. d/b/a COSMETIC MARKET<br><br>　　　　　　　　Defendants. | 18 Civ. 11145 (LTS) (HBP)<br><br><br>**MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF COSMOPOLITAN COSMETICS INC., EUGENE ABRAHAM, AND WILLIAM GOLD TO DISMISS THE FIRST AMENDED COMPLAINT** |

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ..................................................................................1

II.  LEGAL STANDARD...........................................................................................3

III.  ARGUMENT ..................................................................................................4

    A.  PLAINTIFFS HAVE ALLEGED ENOUGH FACTS TO STATE
       PLAUSIBLE CLAIMS FOR TRADEMARK INFRINGEMENT,
       UNFAIR COMPETITION, AND FALSE DESIGNATION OF ORIGIN. ............4

        1.  Decoded Fragrances Are Not Genuine Because They Do Not
          Conform to Plaintiffs' Quality Assurance Standards..................................4

            a.  Plaintiffs' Quality Assurance Program is Substantial and
               Non-Pretextual. ................................................................................6

            b.  Coty, as Exclusive Licensee, May Bring Claims Against
               Defendants' Interference with the Quality of Its
               Fragrances ........................................................................................8

          2.  Decoded Fragrances Are Not Genuine Because They Differ
          Materially from the Products Plaintiffs Authorize for Sale. ....................10

    B.  PLAINTIFFS HAVE ALLEGED ENOUGH FACTS TO STATE
       PLAUSIBLE CLAIMS FOR TRADEMARK COUNTERFEITING. .................13

    C.  PLAINTIFFS HAVE ALLEGED ENOUGH FACTS TO STATE
       PLAUSIBLE CLAIMS AGAINST MESSRS. ABRAHAM AND
       GOLD. ................................................................................................19

IV.  CONCLUSION...............................................................................................21

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Alvarez v. Cty. of Orange, N.Y.*,
   95 F. Supp. 3d 385 (S.D.N.Y. 2015) ............................................................................. 7

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................ 3, 6, 11

*Bambu Sales, Inc. v. Sultana Crackers, Inc.*,
   683 F. Supp. 899 (E.D.N.Y. 1988) ................................................................... 19, 21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................... 3

*Calvin Klein Jeanswear Co. v. Tunnel Trading*,
   No. 98 Civ. 5408 (THK), 2001 WL 1456577 (S.D.N.Y. Nov. 16, 2001) ................... 9

*Cartier v. Aaron Faber, Inc.*,
   512 F. Supp. 2d 165 (S.D.N.Y. 2007) ........................................................... 17, 18, 19

*Chanel Inc. v. Cosmopolitan Cosmetics Inc., Eugene Abraham, et al.*,
   1:12-civ-06042-RJS (Jan. 15, 2013) ........................................................................ 20

*Conley v. Gibson*,
   355 U.S. 41 (1957) ....................................................................................................... 3

*Davidoff & Cie, S.A, v. PLD Int'l Corp.*,
   263 F.3d 1297 (11th Cir. 2001) ................................................................................ 12

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
   806 F.2d 392 (2d Cir. 1986) .................................................................................... 1, 4

*Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*,
   No. 12 CIV. 1416 GBD RLE, 2015 WL 4468083 (S.D.N.Y. July 8, 2015) ............ 14

*Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*,
   17 Civ. 8796 (NRB), 2019 WL 274967 (S.D.N.Y. Jan. 7, 2019) ................ 15, 16, 17

*General Elec. Co. v. Speicher*,
   877 F.2d 531 (7th Cir. 1989) .................................................................................... 18

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985) ..................................................................................... 7

*Gucci Am., Inc. v. Guess?, Inc.*,
   868 F. Supp. 2d 207 (S.D.N.Y. 2012) ................................................................. 14, 15

*Huf Worldwide, LLC v. Wal-Mart Stores*,
   No. 16CV751-LAB (WVG), 2017 WL 766794 (S.D. Cal. Feb. 28, 2017) ...................... 12, 13

*Int'l Diamond Imps., Inc. v. Oriental Gemco (N.Y.), Inc.*,
   64 F. Supp. 3d 494 (S.D.N.Y. 2014) .................................................................... 19, 21

*Johnson & Johnson Consumer Cos. v. Aini*,
   540 F. Supp. 2d 374 (E.D.N.Y. 2008) ....................................................................... 18

*Krasnyi Oktyabr, Inc. v. T.G.F. Prods., LLC*,
   No. CV-05-3020, 2008 WL 4426961 (E.D.N.Y. Sep. 25, 2008) ................................... 9

*Krasnyi Oktyabr, Inc. v. Trilini Imps.*,
   578 F. Supp. 2d 455 (E.D.N.Y. 2008) ......................................................................... 9

*L'Oréal USA, Inc. v. Trend Beauty Corp.*,
   No. 11 Civ. 4187(RA), 2013 WL 4400532 (S.D.N.Y. Aug. 15, 2013) ........................... 9

*Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*,
   112 F.3d 1296 (5th Cir. 1997) ................................................................................. 13

*Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*,
   816 F.2d 68 (2d Cir. 1987) ...................................................................................... 10

*Polymer Tech. Corp. v. Mimran*,
   37 F.3d 74 (2d Cir. 1994) .......................................................................................... 5

*Prince of Peace Enterprises, Inc. v. Top Quality Food Market, LLC*,
   No. 07 Civ. 00349(RJH), 2007 WL 704171 (S.D.N.Y. Mar. 7, 2007) ........................... 9

*Rolex Watch USA, Inc. v. Meece*,
   158 F.3d 816 (5th Cir. 1998) ................................................................................... 18

*Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*,
   982 F.2d 633 (1st Cir. 1992) .............................................................................. 13, 14

*Sweet v. Sheahan*,
   235 F.3d 80 (2d Cir. 2000) ...................................................................................... 19

*TechnoMarine SA v. Jacob Time, Inc.*,
   905 F. Supp. 2d 482 (S.D.N.Y. 2012) .................................................................... 8, 12

*Tiffany and Co. v. Costco Wholesale Corp.*,
   127 F. Supp. 3d 241 (S.D.N.Y. 2015) ................................................................... 15, 16

*Warner-Lambert Co. v. Northside Dev. Corp.*,
   86 F.3d 3 (2d Cir. 1996) ........................................................................................ 5, 8

*Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply, Inc.*,
    106 F.3d 894 (9th Cir. 1997) ................................................................................. 13, 18

*Zino Davidoff SA v. CVS Corporation*,
    No. 06-CV-15332 (KMK), 2007 WL 1933932 (S.D.N.Y. July 2, 2007),
    *aff'd*, 571 F.3d 238 (2d Cir. 2009) .......................................................................... passim

*Zip Int'l Grp., LLC v. Trilini Imps., Inc.*,
    No. 09–CV–2437 (JG)(VVP), 2011 WL 2132980 (E.D.N.Y. May 24, 2011) ......................... 9

**Statutes**

15 U.S.C. § 1114(a)(1) ................................................................................................. 14

15 U.S.C. § 1117(b) ..................................................................................................... 18

**Rules & Regulations**

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 7

Fed. R. Civ. P. 15(a)(2) ................................................................................................ 21

Fed. R. Civ. P. 8(a)(2) ................................................................................................... 3

Fed. R. Evid. 201(b) ...................................................................................................... 7

**Other Authorities**

4 J. Thomas McCarthy,
    *McCarthy on Trademarks and Unfair Competition* § 18:60 (5th ed. 2018) .......................... 8

Plaintiffs submit this memorandum of law in opposition to the Motion to Dismiss Plaintiffs' First Amended Complaint filed by Defendants Cosmopolitan Cosmetics Inc., Eugene Abraham, and William Gold ("Defendants") [ECF No. 40].

## I.    PRELIMINARY STATEMENT

Defendants misrepresent the nature of their business and ignore the controlling law in this Circuit.

Cosmopolitan is **not** an authorized "distributor of genuine cosmetic cosmetics and fragrances" manufactured by Plaintiffs. (ECF No. 41 ("Def. Br.") at 1.) Rather, Defendants knowingly participate in an illicit industry selling fragrance products from which the manufacturers' proprietary codes have been removed or obliterated ("Decoded Fragrances"). Decoded Fragrances are frequently intermingled with counterfeit fragrances manufactured by third parties ("Unauthorized Fakes") and stolen fragrances as they move through unauthorized distribution channels. (ECF No. 31, First Amended Complaint ("FAC")  ¶ 2.) Defendants do not sell Decoded Fragrances unwittingly. To the contrary, as Defendants' counsel conceded at  the Initial Pretrial Conference before Judge Pitman on April 9, 2019, Defendants themselves tamper with Plaintiffs' fragrance products to remove the codes. ECF 44, Transcript at 9. Defendants thereby completely undermine Plaintiffs' efforts to ensure their topical cosmetic products are subject to their ongoing quality assurance program, and are unadulterated and safe to use.

"One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986). Decoding eviscerates this "valuable and important" protection, which is why in *Zino Davidoff SA v. CVS Corporation*, No. 06-CV-15332 (KMK), 2007 WL 1933932 (S.D.N.Y. July 2, 2007), *aff'd*, 571 F.3d 238 (2d Cir. 2009), the Second Circuit, affirming the entry of a preliminary injunction

following an evidentiary hearing, expressly held that *decoded products are not "genuine" goods under U.S. trademark law,* and accordingly, at a minimum, the distribution of Decoded Fragrances constitutes trademark infringement and unfair competition.

Defendants conspicuously fail even to mention Judge Leval's controlling decision in *CVS,* which involved the very same type of unique product coding at issue here (FAC ¶ 43) and is fatal to this motion. The plaintiff in that case, Zino Davidoff SA, is a licensor of Plaintiff Coty Inc. ("Coty"), as are the Plaintiff trademark owners here. There, as here, "the placement of a unique production code ["UPC"] on the bottom of each . . . fragrance bottle and on the bottom of its corresponding package" helped the brand owner (through its exclusive fragrance licensee Coty) "protect against quality defects" and "enhance the effectiveness of [its] ability to detect and prevent the sale of counterfeits." 571 F.3d at 240, 244-45. Accordingly, as the Second Circuit affirmed, the DAVIDOFF fragrance products lacking those codes were materially different from the genuine product, and likely to create confusion and cause irreparable harm. Quite simply, "the absence of codes increased the risk that consumers would unwittingly purchase counterfeit or defective product because of the disabling of Davidoff's device to guard against these things." *Id.* at 247.

Both this Court (Judge Karas) and the Second Circuit categorically rejected CVS's argument, echoed by Defendants here (Def. Br. 5, 10), that the proprietary coding system Coty used for DAVIDOFF fragrances was not "a legitimate quality control procedure" and that Davidoff's customers were not even aware of the codes. 571 F.3d at 244-45. As noted by Judge Karas, among its other functions, the unique code Coty applies to each unit of the fragrances at issue permits it and its licensors to respond to consumer and retailer complaints, to intercept Unauthorized Fakes, and to recall with pinpoint precision any defective products that may be

offered for sale. 2007 WL 1933932, at *2. As Judge Leval explained: "The codes are designed to assist Davidoff and its agents in quality control and the detection of counterfeits as described above. Whether consumers and/or retailers understand the codes is irrelevant to the codes' performance of their function." 571 F.3d at 245. "Nor does the fact that the UPC system also may allow Davidoff to ensnare distributors operating outside the authorized distribution and retail network and to identify importers of gray-market goods defeat its claim. What matters is whether Davidoff's codes are a bona fide control device upon which Davidoff actually relies." *Id.*

As the Second Circuit held in *CVS*, the codes on Coty fragrance products are bona fide control devices on which Coty and its licensors rely to ensure that those products meet their high standards and will not disappoint consumers.  Defendants' motion to dismiss is frivolous and should be denied.

## II.    LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Thus, the complaint need not contain "detailed factual allegations," but "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Plaintiffs have plainly done so here.

III.    ARGUMENT

A.    **PLAINTIFFS HAVE ALLEGED ENOUGH FACTS TO STATE PLAUSIBLE CLAIMS FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND FALSE DESIGNATION OF ORIGIN.**

Defendants seek to excuse their unlawful conduct by mischaracterizing Plaintiffs' FAC as "alleg[ing] that the resale of *genuine* fragrances constitutes trademark infringement." (Def. Br. 1.) But Plaintiffs have alleged no such thing. Rather, as the Second Circuit has confirmed, "goods are *not* genuine if they do not conform to the trademark holder's quality control standards or if they differ materially from the product authorized by the trademark holder for sale." *CVS*, 571 F.3d at 243 (citations omitted) (emphasis added). Here, as in *CVS*, both of these exceptions apply. Plaintiffs have alleged specific facts stating plausible infringement and unfair competition claims on both grounds.

1.    **Decoded Fragrances Are Not Genuine Because They Do Not Conform to Plaintiffs' Quality Assurance Standards.**

As the Second Circuit explained in *El Greco Leather Prods. Co. v. Shoe World, Inc*., 806 F.2d 392 (2d Cir. 1986), a leading case on "whether goods manufactured by agreement with the holder of a trademark, but distributed without authorization of the holder, may be considered 'genuine' for purposes of trademark protection":

> One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.

*Id.* at 395 (citation omitted). Where, as here, a party interferes with a trademark owner's quality control efforts and sells branded products that are not subject to the same quality standards as the genuine branded products, the goods are no longer genuine, for trademark purposes, and their sale constitutes infringement. *See id.* at 396 ("Since we conclude that the shoes were not genuine . . . , it is plain that appellant has made out a violation of § 32(1) of the Lanham Act."). In other

words, products are not "genuine" merely because they were manufactured and originally packaged by the trademark owner or its licensee. *Accord Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996) (preliminarily enjoining Quality King from selling any Halls® cough drops "more than 24 months old"); *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994) ("Goods . . . that do not meet the trademark owner's quality control standards will not be considered genuine goods, and their sale will constitute trademark infringement.").

To demonstrate entitlement to relief on quality control grounds, "a trademark holder is not required to adopt the most stringent quality control procedures available." *Warner-Lambert*, 86 F.3d at 6; *see also CVS*, 571 F.3d at 244. Instead, to state claims for infringement, the trademark owner need only allege:  (1) its quality control procedures are "legitimate, substantial, and non-pretextual"; (2) "it abides by these procedures"; and (3) sales of nonconforming products "will diminish the value of [its] mark." *Warner-Lambert*, 86 F.3d at 6. Plaintiffs did not "regurgitate[] the legal standard set forth in *Warner-Lambert* without providing any supporting facts," as Defendants claim. (Def. Br. 6.)  To the contrary, Plaintiffs allege specific facts satisfying each of these elements, including the following:

- "[E]ach unit of DEEP EUPHORIA, HUGO MAN, BOSS BOTTLED, BOSS THE SCENT, and DAISY MARC JACOBS (among other Plaintiffs' Fragrances) bears a unique code used as a quality assurance, anti-counterfeiting and anti-theft measure (the 'Production Code')," which code Plaintiffs describe in detail (FAC ¶¶ 35-37);

- "At times, unscrupulous third parties," including Defendants here, "remove, obscure, sticker over or otherwise obliterate the Production Codes on fragrances bearing Coty Fragrance Marks ('Decoded Fragrances')" using processes that Plaintiffs describe in detail (*id.* ¶¶ 38, 39);

- "Decoded Fragrances are generally sold by distributors who are not authorized to sell these fragrance products in the United States, and are frequently found in mixed shipments with Unauthorized Fakes and/or stolen products. . . ." (*id.* ¶ 40);

- "[T]he absence of the Production Code significantly interferes with Plaintiffs' quality assurance, anti-counterfeiting and anti-theft programs by hindering Plaintiffs' ability to trace the products, thereby potentially endangering the public by preventing

Plaintiffs from identifying Unauthorized Fakes, resolving quality problems, and recalling defective products. . . ." (*id.* ¶ 42); and

- "By selling Decoded Fragrances, Defendants impair Plaintiffs' quality control and anti-counterfeiting programs, . . . deprive Plaintiffs of the ability to maintain the prestige and reputation of the brands sold under Coty Fragrance Marks," create a likelihood of confusion among "purchasers and prospective purchasers" as to whether the Decoded Fragrances are "authorized and backed by Plaintiffs, when in fact they are not," and create a "potential public health risk," all of which "is causing irreparable harm to Plaintiffs' reputation and goodwill and impairing the efficacy of their anti-counterfeiting efforts." (*id.* ¶¶ 58-60).

In sum, as Plaintiffs alleged, and as the Court must accept as true, *see Iqbal*, 556 U.S. at 678, "Plaintiffs have established and follow legitimate, substantial, and non-pretextual quality control procedures for their fragrance products to ensure the uniformly high quality of their products and ultimately the value of their brands." FAC ¶ 35.[1] In light of Judge Leval's holding in *CVS* that *the very same procedures Plaintiffs describe in the FAC* were "legitimate, substantial, [and] nonpretextual," and that "removal of the codes expose[d] [Davidoff] to a realistic risk of increased incidence of counterfeits with resultant damage to the reputation of its mark," *CVS*, 571 F.3d at 244, Plaintiffs obviously have stated plausible claims for infringement, unfair competition, and false designation of origin under Sections 32(1) and 43(a) based on their right to control the quality of the goods bearing their marks.

### a.   Plaintiffs' Quality Assurance Program is Substantial and Non-Pretextual.

Defendants next make several fallacious claims about the facts alleged in Paragraph 35 of the FAC. They assert that Plaintiffs' claim to use Production Codes on "each unit of DEEP EUPHORIA, HUGO MAN, BOSS BOTTLED, BOSS THE SCENT, and DAISY MARC JACOBS" is "blatantly false" and even that Plaintiffs themselves "allege that only a handful of

---

[1] This paragraph, among others, refutes Defendants' assertion that "the Amended Complaint does not even allege that Plaintiffs themselves abide by the alleged quality control procedures, as required by Second Circuit law." (Def. Br. 9).

[their] fragrances utilize the Production Code at issue here" rendering Plaintiffs' "quality control procedures . . . not 'substantial.'" (Def. Br. 6, 8). Defendants erroneously construe the phrase "among other Plaintiffs' Fragrances" in Paragraph 35 to mean "only a *de minimus* [sic] number of Plaintiffs' products utilize a Production Code." (*Id*. at 9.) In fact, Plaintiffs used that phrase because Plaintiffs' use of Production Codes is not limited to the fragrances at issue.

Of course, for purposes of a motion to dismiss, the Court must accept as true the well-pleaded allegations of the complaint. It cannot on this motion properly consider Defendants' photographs of fragrance products of unknown provenance (Def. Br. 7-8) or resolve factual issues such as the legitimacy of Plaintiffs' quality assurance and anti-counterfeiting programs. "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). And Defendants' unauthenticated photographs are manifestly *not* the type of "facts" of which a Court may take judicial notice. Fed. R. Evid. 201(b); *Alvarez v. Cty. of Orange, N.Y.*, 95 F. Supp. 3d 385, 398 (S.D.N.Y. 2015) ("[F]acts appropriate for judicial notice must . . . [be] common knowledge [or] derived from an unimpeachable source.") (citations omitted).

Further, as their counsel must surely know, Defendants' factual showing is not only improper on this motion but falls far short of disproving the well-pleaded facts in the FAC.  The Court has no way of knowing whether the products Defendants feature so prominently in their brief are Unauthorized Fakes, Decoded Products, outdated products, or products removed from gift sets or other special packaging. Also fallacious is Defendants' assumption that Plaintiffs must employ the same quality assurance system for all of their products in order for the system to be "substantial." Plaintiffs employ different procedures for different products. *CVS*, 2007 WL

1933932, at *1 (noting Coty's use of batch and unique unit codes for different products). It certainly does not follow that Plaintiffs' use of unique serial coding (an expensive measure providing the highest degree of traceability, down to the individual unit) is an insubstantial quality assurance measure, as Defendants argue. "A trademark holder is entitled, without losing its right to protect what value the mark has, to make a business judgment that additional quality control measures would add less value to the mark than their cost." *Warner-Lambert*, 86 F.3d at 7.

Defendants cite only one case in support of this argument, *TechnoMarine SA v. Jacob Time, Inc.*, 905 F. Supp. 2d 482, 490-91 (S.D.N.Y. 2012) (Def. Br. 9). But Judge Forrest there dismissed the plaintiff's trademark claims because the plaintiff did not "specifically allege an actual disruption in quality control procedures and how such disruption has or would be likely to damage the product itself and thus impact the value of the mark," and indeed made "*no such allegations* . . . regarding the content of the quality control procedure it employs and whether such procedure is likely to be 'substantial.'" (emphasis added). The FAC in this action plainly does not share that pleading defect. *See* FAC ¶¶ 35-42, 58-60.

### b. Coty, as Exclusive Licensee, May Bring Claims Against Defendants' Interference with the Quality of Its Fragrances

Finally, Defendants make the far-fetched argument that because "[t]he Production Codes at issue here are applied by Coty, who is merely a licensee of the asserted trademarks," "[t]he quality control exception is therefore inapplicable." Def. Br. 9-10. *This is not the law.* Just as a trademark owner can entrust the manufacture of its product to a licensee, it can entrust that licensee with implementing appropriate quality assurance. 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:60 (5th ed. 2018) ("There seems to be no reason why the licensor should not be permitted to appoint a third party agent to carry out the actual

inspection and evaluation of the licensee's goods and services and to measure them against the standards created or adopted by the licensor."). In the *CVS* case, which Defendants again conveniently ignore, Coty applied the codes to the Davidoff fragrances at issue. 571 F.3d at 240.

Moreover, an exclusive licensee such as Coty has standing to bring an action in its own name for unfair competition where, as here the licensor's trademark has been infringed. Section 43(a) expressly provides standing to "*any person* who believes that he or she is or is likely to be damaged" by the acts in that section (emphasis added), and "[c]ourts have consistently recognized that this broad language confers standing on trademark licensees." *Calvin Klein Jeanswear Co. v. Tunnel Trading*, No. 98 Civ. 5408 (THK), 2001 WL 1456577, at *5 (S.D.N.Y. Nov. 16, 2001) (collecting cases). It is hardly surprising, then, that district courts in this Circuit have consistently reached the merits of quality control claims brought by exclusive licensees. *See, e.g.*, *L'Oréal USA, Inc. v. Trend Beauty Corp.*, No. 11 Civ. 4187(RA), 2013 WL 4400532 (S.D.N.Y. Aug. 15, 2013); *Zip Int'l Grp., LLC v. Trilini Imps., Inc.*, No. 09–CV–2437 (JG)(VVP), 2011 WL 2132980 (E.D.N.Y. May 24, 2011); *Krasnyi Oktyabr, Inc. v. T.G.F. Prods., LLC*, No. CV-05-3020, 2008 WL 4426961 (E.D.N.Y. Sep. 25, 2008); *Krasnyi Oktyabr, Inc. v. Trilini Imps.*, 578 F. Supp. 2d 455 (E.D.N.Y. 2008).

*Prince of Peace Enterprises, Inc. v. Top Quality Food Market, LLC*, No. 07 Civ. 00349(RJH), 2007 WL 704171 (S.D.N.Y. Mar. 7, 2007), cited by Defendants (Def. Br. 10), does not hold otherwise. Instead, Judge Holwell sidestepped the issue in dictum (describing it only as "questionable" whether a licensee may assert such a claim), went straight to the merits of the plaintiff's quality control argument, and concluded the plaintiff did not have much of an argument, as its "quality control" program consisted entirely of "removing expired products from store shelves." *See id. at *5.*

In stark contrast, Plaintiffs here have alleged in detail the lengths to which they go to control the quality of "the production of Plaintiffs' Fragrances, as well as over their bottling, their completed packaging, and their distribution." FAC ¶¶ 35-42. Defendants profit by intentionally frustrating these quality control efforts and offering the public topical cosmetic products that lack the same quality safeguards as Plaintiffs' authorized products. *Id.* ¶¶ 58-60. As Plaintiffs' FAC plausibly alleges, Defendants' conduct constitutes trademark infringement, unfair competition, and false designation of origin.

### 2. Decoded Fragrances Are Not Genuine Because They Differ Materially from the Products Plaintiffs Authorize for Sale.

The Second Circuit has clearly held "goods are not genuine if they . . . differ materially from the product authorized by the trademark holder for sale." *CVS*, 571 F.3d at 243 (citing *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir. 1987)).  In assessing such differences, "we apply a low threshold of materiality, requiring no more than a slight difference which consumers would likely deem relevant when considering a purchase of the product."  *Id.* at 246.

Here, Plaintiffs have alleged specific facts more than sufficient to support their claim of material differences, including the following:

- "At a minimum, Decoded Fragrances are materially different from genuine Plaintiffs' Fragrances because, inter alia, they are not date-stamped and are not subject to Plaintiffs' ongoing quality assurance programs. Because the quality of fragrance products deteriorate over time, and because consumers expect consistent high quality fragrance products from Plaintiffs, these differences are obviously significant to the consuming public." (FAC ¶ 41);

- "In many instances the removal of the Production Code and resulting mutilation of genuine product packaging degrades the products. . . . Further, the absence of the Production Code and/or the mutilation of the packaging are each in and of themselves material differences from the authorized fragrances that are distributed by Coty in the U.S." (*id.* ¶ 42); and

- "Purchasers and prospective purchasers viewing Defendants' Decoded Fragrances and perceiving a defect, lack of quality, or any other irregularity are likely to attribute them mistakenly to Plaintiffs. The likelihood of confusion, mistake and deception engendered by Defendants' unauthorized products is causing irreparable harm to Plaintiffs' reputation and goodwill and impairing the efficacy of their anti-counterfeiting efforts." (*id.* ¶ 59).

Taking these allegations as true, *see Iqbal*, 556 U.S. at 678, Plaintiffs easily have stated plausible trademark claims based on the material differences between the Decoded Fragrances and the genuine coded products bearing Plaintiffs' marks.

Defendants nonetheless argue that "the Complaint fails to offer any facts from which it could be reasonably inferred that consumers would consider any of these differences relevant when making a purchase," and "[a]s [a] matter of common sense, the presence or absence of a Production Code cannot be 'material' to consumers." Def. Br. 10-11. Defendants are wrong on both counts. First, Plaintiffs expressly allege that "consumers expect consistent high quality fragrance products from Plaintiffs," and the differences between Plaintiffs' genuine products and the Decoded Fragrances "are obviously significant to the consuming public." FAC ¶ 41. As the Second Circuit reiterated in *CVS*, "[i]n attaching its mark to its goods over time, a holder assures consumers that the goods conform to the mark holder's quality standards. Reputation for quality, whether good or bad, becomes associated with a mark in the minds of consumers. Many consumers are willing to pay more to buy goods bearing a mark which experience has taught the consumer represents an assurance of high quality." 571 F.3d at 243-44.

Consumers obviously care whether topical cosmetics products are backed by the manufacturers' quality assurance guarantees or not. They care whether those products are real or fake. They care whether there is a mechanism in place so that they can ascertain whether a safety warning or product recall applies to a product they own. They care whether someone has tampered with or adulterated that product. Whether or not they understand that the codes on the

fragrance products at issue are used for these purposes is of no consequence. *Id.* at 245

("Whether consumers and/or retailers understand the codes is irrelevant to the codes'

performance of their function.").

Second, as the Second Circuit also recognized, tampering with product packaging to

remove the codes can diminish the physical appearance and allure of luxury fragrance products:

> Characteristically, sellers of luxury goods, such as fragrances, go to great length
> and expense to present the trademarked merchandise in appealing packaging. For a
> seller to damage the packaging by cutting away portions or applying acids to blur
> markings detracts from the value of the product. . . . It is a logical inference that
> consumers may regard a product whose packaging has been tampered as inferior
> and perhaps suspicious. Mutilation of packaging to conceal markings may lead the
> consumer to suspect that the item is stolen merchandise, or is defective and has
> been diverted from a recall, or is otherwise untrustworthy. . . . *In short, trademarked
> goods whose luxury packaging is damaged are materially different from those that
> are intact.*

*CVS*, 571 F.3d at 246 (citing *Davidoff & Cie, S.A, v. PLD Int'l Corp.*, 263 F.3d 1297, 1303–04

(11th Cir. 2001)) (emphasis added).

Defendants seem to think that by closing their eyes and not citing the leading Second

Circuit precedent they can make it go away. Not surprisingly, then, the cases Defendants do cite

are factually distinguishable and underscore the frivolity of their argument. Defendants once

again rely on *TechnoMarine*, 905 F. Supp. 2d at 491 (Def. Br. 11), the only opinion Defendants

cite from within the Second Circuit for this point, without merit. There, Judge Forrest dismissed

the plaintiff's trademark claims because, *inter alia*, there was no "allegation of alteration of serial

numbers or other identifying packaging that might prevent the mark holder from controlling

product quality . . . ." Here, of course, Plaintiffs' FAC is replete with precisely such allegations.[2]

---

[2] Similarly, in *Huf Worldwide, LLC v. Wal-Mart Stores*, No. 16CV751-LAB (WVG), 2017 WL
766794 (S.D. Cal. Feb. 28, 2017) (Def. Br. 10), the court dismissed claims that Wal-Mart's
application of pricing stickers "materially altered" plaintiff's products because the stickers "may
obscure" plaintiff's own barcodes. But the plaintiff there failed to allege "[i]f these barcodes are

Defendants evidently have not read the whole decision in *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co*., 112 F.3d 1296 (5th Cir. 1997) (Def. Br. 12), which plainly supports Plaintiffs' position:  "[P]laintiff need not prove that the defendant's imports are of inferior quality to establish trademark infringement, only that they are materially different." *Id.* at 1302. The same is true for *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 643 (1st Cir. 1992) (Def. Br. 12):  "We conclude that the existence of any difference between the registrant's product and the allegedly infringing gray good that consumers would likely consider to be relevant when purchasing a product creates a presumption of consumer confusion sufficient to support a Lanham Trade-Mark Act claim."  *Id.* ("Differences in quality control methods, although not always obvious to the naked eye, are nonetheless important to the consumer.")

### B.   PLAINTIFFS HAVE ALLEGED ENOUGH FACTS TO STATE PLAUSIBLE CLAIMS FOR TRADEMARK COUNTERFEITING.

In arguing that "Plaintiffs' counterfeiting claim is baseless and should be dismissed," (Def. Br. 15), and even invoking Rule 11 (*id.* at 13), Defendants improperly substitute a colloquial  meaning of the term "counterfeit"  for the legal definition. As a matter of law, a counterfeit mark need not be a copy of the original, and a counterfeit product need not be an Unauthorized Fake manufactured by a person without authority to do so. Under U.S. trademark law, "[w]hen an original mark is attached to a product in such a way as to deceive the public, the product itself becomes a 'counterfeit' just as it would if an imitation of the mark were attached." *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894, 900 (9th Cir. 1997) (affirming counterfeiting verdict against sellers of reconditioned Westinghouse circuit

---

a crucial 'quality control mechanism' that permits detection of counterfeits or gives [plaintiff] the ability to recall defective products." *Id.* at *1-*2 (citing *CVS*, 571 F.3d at 240).

breakers who attached genuine Westinghouse labels without disclosing the goods were reconditioned). The sale of a materially different product, even if it originated from the trademark owner, "may well turn an otherwise 'genuine' product into a 'counterfeit' one." *Nestle*, 982 F.2d at 638.  Defendants' decoded fragrance products may or may not be Unauthorized Fakes (FAC ¶ 38), but even if they were originally manufactured by Coty, Defendants' removal of Plaintiffs' proprietary codes, which assure the uniformly high quality of Plaintiffs' fragrance products, turns "an otherwise 'genuine' product into a 'counterfeit' one," *id.*, within the meaning of the Lanham Act.

Under Section 32 of the Lanham Act, a person engages in counterfeiting by "us[ing] in commerce any . . . **counterfeit . . . of a registered mark** in connection with the sale, offering for sale, distribution, or advertising of **any goods** . . . on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a)(1)(emphasis added). Section 45, in turn, defines a "counterfeit" as "**a spurious mark** which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127 (emphasis added). "Although 'spurious' is not a statutorily defined term under the Lanham Act," courts in this Circuit have defined it as "[d]eceptively suggesting an erroneous origin; fake." *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co*., No. 12 CIV. 1416 GBD RLE, 2015 WL 4468083, at *3 (S.D.N.Y. July 8, 2015) (collecting cases).

Counterfeiting, or trademark infringement in the "first degree," *see Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012), differs from infringement in three ways:

> First, the alleged counterfeit must copy a *registered* mark; second, the copying must be so direct that the alleged counterfeit appears *identical* to (or else substantially indistinguishable from) the registered mark; and third, . . . the counterfeit must be used to *"pass[ ] off"* the infringer's product as the original, rather than merely

presented in a manner likely to confuse some consumers as to the origin or sponsorship of the infringer's product.

*Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*, 17 Civ. 8796 (NRB), 2019 WL 274967, at *3 (S.D.N.Y. Jan. 7, 2019) (citation omitted). In short, a counterfeiter "seeks to trick the consumer into believing he or she is getting the genuine article . . . ." *Gucci*, 868 F. Supp. 2d at 242.

Decoded Fragrances bearing Plaintiffs' registered marks are ***not*** the "genuine article," yet Defendants deliberately seek to pass them off as the genuine article. This is the very essence of a claim for willful counterfeiting. *See*, *e.g.*, *Tiffany and Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 255 (S.D.N.Y. 2015) (granting summary judgment on counterfeiting when defendant "used in commerce an identical counterfeit of a registered mark in connection with the sale, offering for sale, or advertising of its [products] and . . . such use was spurious and likely to cause confusion, or to cause mistake, or to deceive") (internal quotations and citations omitted). Plaintiffs' First Amended Complaint alleges each and every element of that claim:

- Plaintiffs' marks are registered with the United States Patent and Trademark Office, including the marks CALVIN KLEIN DEEP EUPHORIA, HUGO BOSS BOTTLED, HUGO BOSS THE SCENT, and DAISY MARC JACOBS (FAC ¶¶ 22, 23, 28, 33 & Exhs. A-C);

- "Defendants have, at a minimum, distributed, sold, and/or offered for sale decoded units of the fragrances CALVIN KLEIN DEEP EUPHORIA, HUGO BOSS BOTTLED, HUGO BOSS THE SCENT, and DAISY MARC JACOBS." (*id.* ¶ 45);

- "Upon information and belief, Cosmopolitan is itself tampering with Plaintiffs' Fragrances to remove their codes or has instructed third parties to do so," (*id.* ¶ 57), creating products "materially different from genuine Plaintiffs' Fragrances . . . and . . . beyond the reach of Plaintiffs' product integrity and quality controls" (*id.* ¶ 3);

- Decoded Fragrances bear marks identical to Plaintiffs' registered marks (*id.* ¶ 38);

- Defendants' conduct is "willful" (*id.* ¶ 70); and

- As a result of Defendants' willful conduct, "the public is likely to believe that these [Decoded Fragrances] have been manufactured and/or approved by the respective owners of those marks and are subject to their quality control measures" when in fact they are not (*id.* ¶ 69).

15

Defendants argue that "no amount of hand waving can transform brand new and genuine products into counterfeits." (Def. Br. 13.) But Defendants have done far more than "sell fragrances manufactured, packaged and sold into the stream of commerce by Plaintiffs" (*id*.), as they would have the Court believe. They have deliberately tampered with Plaintiffs' fragrance products by removing the device that permits Plaintiffs to control their quality at each stage of the manufacturing and distribution process and even after sale, then turned around and sold them as genuine goods. Stripped of overheated rhetoric, Defendants essential argument is that their conduct does not fit within the popular understanding of "counterfeiting"—that is, slapping a luxury brand on a cheap knockoff and selling the Unauthorized Fake as the genuine article. But the trademark law does not define "counterfeiting" so narrowly.

In *Tiffany & Co.*, 127 F. Supp. 3d at 255, for example, Costco's expert witness testified that Costco's rings "were not 'counterfeit' in any sense in which [he had] ever heard the term 'counterfeit' used," to refute Tiffany's argument that Costco's "purposeful placement of the Tiffany mark on the display case signs" for diamond solitaire rings that were "essentially copies of Tiffany's" was sufficient to establish counterfeiting under the Lanham Act. Even though the rings themselves were not Unauthorized Fakes and bore their own branding, this Court nevertheless found Costco had engaged in counterfeiting as a matter of law:

> The Court has already concluded that Tiffany has established actual confusion and that Costco has utilized a word mark identical to the one that Tiffany has registered. Furthermore, the Court has found that Costco was not acting in good faith when it adopted the Tiffany mark, which in turn establishes Costco's intent to confuse customers as to the source of its rings. Thus, Costco's use of the Tiffany mark may be considered "spurious" as a matter of law.

*Id*.

Similarly, in *Fujifilm*, 2019 WL 274967 at * 6, Fujifilm took issue with Polaroid's claim that Fujifilm had engaged in counterfeiting by selling instant film—in packaging clearly marked

with Fujifilm's famous marks—that, once removed from that packaging and used as intended, bore no Fujifilm marks and was substantially indistinguishable from the registered product configuration of the iconic Polaroid snapshot. Judge Buchwald refused to dismiss this counterfeiting claim, writing that Polaroid had plausibly alleged each element of the claim, including that "a reasonable consumer seeing Fujifilm's product [outside of the packaging] would mistakenly conclude that Polaroid was its source. No more is needed to plead the 'spurious' element of [Polaroid's] counterfeiting claim." *Id.* at *6.

Costco and Fujifilm were not selling Unauthorized Fakes, and so their conduct might not fall under colloquial definitions of "counterfeiting," but that conduct nonetheless satisfied the statutory definition.

Nor is the reach of the Lanham Act's prohibition on counterfeiting confined to cases in which a defendant places a copy of the plaintiff's registered mark on a product. In *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165 (S.D.N.Y. 2007), for example, Cartier and other luxury watch companies claimed defendant J & P engaged in counterfeiting when it "purchased genuine watches manufactured by Plaintiffs, added diamonds to them, and sold them or offered them for sale on consignment to auction houses, such as Christie's and Sotheby's." *Id.* at 169. "The watches retained Plaintiffs' original marks, and they displayed no additional mark indicating that the diamonds had been added by J & P, not the original manufacturer." *Id.*

Like Defendants here, J & P argued "trademark law does not preclude the unauthorized sale of genuine goods bearing an original mark." *Id.* at 170. The court disagreed, observing that "J & P significantly modified watches manufactured by Plaintiffs, but did not mark the watches to disclose this fact to the public." *Id.* This conduct "create[d] a likelihood that customers would be deceived into believing that the alterations were performed by the original manufacturers,"

17

and therefore "[t]he watches modified and sold by J & P . . . constitute[d] 'counterfeit' merchandise for purposes of the Lanham Act." *Id.* at 169 (citing *Westinghouse Elec. Corp., supra,* 106 F.3d at 900); *see also General Elec. Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir. 1989) (sale of third-party substitute products in plaintiff's genuine packaging is counterfeiting under the Lanham Act; "[s]ince the mark had been placed on the boxes by General Electric, it was not a counterfeit in the literal sense," but the literal sense is not "the correct one"); *Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816, 826 (5th Cir. 1998) (reversing and remanding for determination as to whether sale of Rolex watches modified with non-genuine parts constitutes counterfeiting under the Lanham Act; "other courts have found that similar uses of genuine trademarks constitute counterfeiting"); *remanded to* 2000 WL 33582648, at *4 (N.D.Tex. Jan. 25, 2000) (entering judgment of counterfeiting and awarding treble profits under 15 U.S.C. § 1117(b)); *Johnson & Johnson Consumer Cos. v. Aini*, 540 F. Supp. 2d 374, 387 (E.D.N.Y. 2008) (holding that materially different versions of AMBI Green and Red products manufactured in Jamaica were counterfeits of AMBI products sold in the United States although both products possessed authentic and registered trademarks).

   As a matter of law, Plaintiffs' allegations, if true, establish that Defendants have unlawfully used "counterfeit marks" within the meaning of Section 45 of the Lanham Act. The marks at issue are registered for fragrance products; Defendants are intentionally marketing and selling fragrance products bearing Plaintiffs' registered marks that do not conform to Plaintiffs' quality control standards and differ materially from Plaintiffs' authorized products because they are no longer subject to Plaintiffs' ongoing quality control. As a result, consumers are likely to be deceived that Defendant's Decoded Fragrances are the same as those found in authorized retailers, when in fact they are not. *See* FAC ¶¶ 3, 44, 63-70.

"[D]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000) (citations omitted). If proven, the facts alleged in the First Amended Complaint would establish that Defendants' conduct satisfies the statutory requirements for trademark counterfeiting. Accordingly, Plaintiffs' counterfeiting claims—which are alleged to support enhanced remedies under the First Claim for Relief for Trademark Infringement but are not the only basis for that claim—should not be dismissed.

### C. PLAINTIFFS HAVE ALLEGED ENOUGH FACTS TO STATE PLAUSIBLE CLAIMS AGAINST MESSRS. ABRAHAM AND GOLD.

"[U]nder the Lanham Act, a corporate officer may be held personally liable for trademark infringement and unfair competition if the officer is a moving, active[,] conscious force behind [the defendant corporation's] infringement." *Int'l Diamond Imps., Inc. v. Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 515 (S.D.N.Y. 2014) (quoting *Cartier*, 512 F. Supp. 2d at 170). To hold the officer individually liable, a plaintiff need only plead and prove the officer "authorized and approved the acts of unfair competition which are the basis of [the] . . . corporation's liability . . . ." *Id.* (quoting *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 913 (E.D.N.Y. 1988)). "Further, in determining whether the officer's acts render him individually liable, '[it] is immaterial whether ... [he] knows that his acts will result in an infringement.'" *Bambu Sales*, 683 F. Supp. at 913-14 (citation omitted).

Defendants seek dismissal of Plaintiffs' claims against Messrs. Abraham and Gold, Cosmopolitan's CEO and President respectively, but have not complied with the Court's rules with respect to this prong of their motion.[3] They argue that "simply having an ownership interest

---

[3] Contrary to Rule 2(b) of the Court's Individual Rules of Practice *and* Cosmopolitan's certification that "it has used its best efforts to resolve the matters raised in the instant Motion," (ECF No. 40 at 1), Defendants' January 25, 2019 letter did not include Plaintiffs' claims against

in a company is insufficient to establish personal liability with respect to [a] corporate officer."

(Def. Br. at 15.) Of course, Plaintiffs have not simply alleged an ownership interest, but have

alleged that both individual defendants (a) are officers of Defendant Cosmopolitan Cosmetics

Inc. ("Cosmopolitan"), (b) control that company's acts ("including the acts complained of

herein"), and (c) are directly responsible for or have otherwise orchestrated Cosmopolitan's

unlawful activities. (FAC ¶¶ 16, 17.) Plaintiffs are informed and believe these facts to be the case

because Mr. Abraham is identified as the Chief Executive Officer of Cosmopolitan in

Defendants' initial disclosures, in the New York Department of State's database, and on

Cosmopolitan's website at www.cosmopolitanusa.com/aboutus/meet-the-team/; Mr. Abraham

entered into a consent judgment and permanent injunction in his individual capacity in 2013,

confirming that "I am an owner of and controls [sic] Cosmopolitan Cosmetics," *see Chanel Inc.*

*v. Cosmopolitan Cosmetics Inc., Eugene Abraham, et al.*, 1:12-civ-06042-RJS (Jan. 15, 2013),

ECF No. 18 at 11; Defendants identified Mr. Gold in their initial disclosures as the President of

Cosmopolitan and having knowledge as to the "acquisition and distribution of the accused

products"; and Coty has, in the past, advised Mr. Gold of the *CVS* decision and provided him

with the particulars necessary to identify Decoded Fragrances (FAC ¶ 51-54 and Ex. H).

Further, Defendants admit that Cosmopolitan itself decodes Plaintiffs' fragrances. ECF

No. 44, Transcript at 9. Common sense dictates that company employees would not tamper with

pristine fragrance products intended for sale unless instructed to do so by their superiors—and

---

Messrs. Abraham and Gold among the "various deficiencies" Defendants identified in Plaintiffs'
original Complaint (indeed, Messrs. Abraham and Gold were not even defendants at that time).
Defendants raised the issue for the first time in their brief in support of this motion. Defendants'
assertion that "Plaintiffs refiled a substantially identical pleading" "rather than address the
specific deficiencies identified by Cosmopolitan" also is misleading. *See* Def. Br. 1. In fact,
Plaintiffs substantially revised their original Complaint in an effort to help Defendants
understand the claims against them. *See* ECF No. 31-9 (redline).

that Defendants' counsel would not freely concede that Cosmopolitan engaged in such tampering unless they were apprised of that fact and authorized to disclose it by the company's top management.

Plaintiffs' allegations against Messrs. Abraham and Gold are more than sufficient to hold those officers individually liable for Cosmopolitan's unlawful acts. *See Int'l Diamond Imps.*, 64 F. Supp. 3d at 525 (plaintiff stated plausible claims against the corporate officer by alleging he was "responsible for the control, management, operation, and maintenance of the affairs" of the corporate defendant and "[t]he acts and wrongful conduct complained of were done with [his] active assistance, cooperation, acquiescence, and procurement, and he derives financial benefit therefrom"); *Bambu Sales*, 683 F. Supp. at 913-14 (holding liable individual defendants who were directly involved in the purchase, approval, and resale of infringing products).

## IV.   CONCLUSION

Plaintiffs have pleaded more than sufficient facts to state plausible claims for relief against Defendants Cosmopolitan and its principals Messrs. Abraham and Gold, and respectfully ask the Court to deny in its entirety Defendants' motion to dismiss the First Amended Complaint. In the event the Court finds any of Plaintiffs' claims insufficient, Plaintiffs respectfully request leave to amend their complaint to remedy any defects. *See* Fed. R. Civ. P. 15(a)(2).

DATED: May 1, 2019                           Respectfully submitted,

                                             KILPATRICK TOWNSEND & STOCKTON LLP

                                             By: */s/ Robert Potter*

                                             Lisa Pearson (LP 4916)
                                             *lpearson@kilpatricktownsend.com*
                                             Robert Potter (RP 5757)
                                             *rpotter@kilpatricktownsend.com*
                                             1114 Avenue of the Americas
                                             New York, New York  10036

Telephone: (212) 775-8700
Facsimile: (212) 775-8800

*Attorneys for Plaintiffs*

15438426V.6